# EXHIBIT
# B

**DECLARATION OF ANDRE KURZ, ATTORNEY-AT-LAW, IN SUPPORT OF APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

André Kurz, attorney-at-law, declares the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am an attorney admitted to practice law in Switzerland since April 30th, 2013. I held various positions as in-house legal counsel and have been an independent attorney-at-law since 2021. I am based in Zurich, Switzerland and practice law at Kurz Legal. Over the course of my professional career, I have gained significant experience in Swiss criminal law and criminal procedure, including domestic and cross-border commercial disputes and criminal proceedings. I believe that I am appropriately qualified to express an informed view on the matters covered by this declaration.

2. I am counsel to Union des Associations Européennes de Football ("UEFA") in connection with a contemplated Swiss criminal proceeding described below (the "Contemplated Criminal Proceeding").

3. I make this declaration based on my personal knowledge, experience, and education, and on my review of the factual record provided to me by UEFA and counsel in the United States, including the Exhibits attached to applications for discovery submitted under 28 U.S.C. § 1782 (the "Section 1782 Applications") seeking discovery from individuals and entities for use in the Contemplated Criminal Proceeding. The opinions expressed in this declaration are my own.

4. Below, I describe (I) the factual basis for the Contemplated Criminal Proceeding; (II) the elements and jurisdictional basis of the Contemplated Criminal Proceeding under Swiss criminal law; (III) UEFA's standing to bring the Contemplated Criminal Proceeding; (IV) the amenability of Swiss authorities to receiving discovery obtained through the Section 1782

Applications; and (V) the relevance of the discovery UEFA seeks to the Contemplated Criminal Proceeding.

## I. FACTUAL BASIS FOR THE CONTEMPLATED CRIMINAL PROCEEDING

5. Fédération Internationale de Football Association ("FIFA") is a Swiss nonprofit association with its statutory seat in Zurich, Switzerland. UEFA is likewise a Swiss nonprofit association, comprised of 55-member national football associations.

6. FIFA was founded in 1904 and is composed of 211 national football associations from around the world. Through its members, FIFA stands at the head of an organized system of football that reaches virtually every country in the world. FIFA's flagship competition, the FIFA World Cup, is among the largest and most valuable sporting events in the world. Despite its commercial success, FIFA is not a commercial corporation operated for the benefit of shareholders or private owners; it is a nonprofit membership association whose stated objectives include expanding and improving football worldwide, organizing international competitions, developing the women's game, promoting football's educational, cultural, and unifying values, and protecting the sport from corruption.

7. FIFA's members are organized geographically into six regional confederations, of which UEFA—the confederation representing Europe—is among the most consequential to the governance, economics, and competitive success of the global game. UEFA's members are the 55 national football associations responsible for governing the sport throughout Europe, including the associations of England, France, Germany, Italy, and Spain, among others. Those 55 associations are also members of FIFA and represent more than one-quarter of FIFA's entire membership, and Europe holds nine seats on FIFA's 37-member Council, the largest representation of any confederation. UEFA thus serves as one of the principal institutional voices within FIFA representing the interests of a constituency responsible for an outsized share of the global game's

sporting and economic value.

8. FIFA is, at its core, a member-driven organization. Ultimate authority rests with the FIFA Congress, which FIFA's own Statutes designate as its supreme and legislative body; the Congress consists of FIFA's 211 member associations, each of which has one vote, and among other responsibilities elects the FIFA President, approves and amends FIFA's governing Statutes, and elects members of FIFA's principal independent bodies. Beneath the Congress sits the 37-member FIFA Council, which sets FIFA's strategic direction and oversees the organization between meetings of the Congress; the Council's members are elected through FIFA's six regional confederations (with exception to the Presidents of the six Confederations who are ex officio vice-presidents of the FIFA Council) rather than selected by the President, ensuring that FIFA's constituent membership is represented in the organization's principal governing body. The FIFA President sits within, not above, that structure: the President is elected by FIFA's members to represent the organization and preside over the Congress and Council, has no vote in the Congress, and ordinarily holds only one vote among the 37 members of the Council. Although FIFA owns the commercial rights arising from its competitions, FIFA's Statutes provide that the Council alone decides whether and how those rights are to be promoted, including whether FIFA will do so itself, jointly with third parties, or through third parties.

9. On July 28, 2026, FIFA publicly announced a plan, known as "FIFA Forward Enterprise" or "FFE," to transfer the commercial rights to the men's and women's World Cups and the Club World Cup into a new subsidiary and to sell an interest of approximately 20 percent of that subsidiary to outside investors, led by Joshua Kushner through a Thrive Capital Management–affiliated permanent-capital investment vehicle for approximately USD 4.2 billion. Greg Maffei, the CEO of BANN Ventures, and J.P. Morgan acted as advisers on the plan.

10. Among other documents, I have reviewed FIFA President Gianni Infantino's own letter of July 28th to the FIFA Council announcing the proposal, in which Infantino states that "the financial commitment of an anchor investor in FIFA Forward Enterprise has been secured, Thrive Capital, who have agreed to underwrite this proposal," and that the anchor investor's commitment would guarantee the proposed payments to FIFA's member associations. That letter confirms that Thrive's commitment as anchor investor had already been finalized before the FIFA Council or the 211 member associations were consulted on, or asked to approve, the proposal. *See* Infantino Letter (Exhibit A).

11. I understand that the FFE proposal was developed over a period of months by a small circle around Infantino without the knowledge or involvement of the FIFA Council, the confederations, or FIFA's 211 member associations. I further understand that Infantino personally negotiated the material terms of the FFE proposal directly with Kushner and Thrive, without a competitive process, an independent valuation, or referral to FIFA's ordinary procurement or related-party approval procedures, and that Infantino and Kushner have a relationship that predates the FFE proposal, as well as a relationship cultivated over years with Kushner's brother, Jared Kushner, and, through that relationship, with the President of the United States. Under FIFA's own Statutes, the FIFA Congress—composed of FIFA's 211 member associations, each holding one vote—is the supreme and legislative body of the organization, and the FIFA Council is vested with exclusive authority to decide how FIFA's commercial rights are to be promoted. Neither body was consulted or afforded the opportunity to approve the FFE proposal. The proposal was instead approved internally by a narrow three-to-two vote of a five-member bureau of FIFA's internal management board convened and controlled by Infantino, at which the two FIFA executives principally responsible for the organization's day-to-day operations and finances declined to

endorse it one of which (Kevin Lamour) has left FIFA on 17 August 2026. The FFE proposal was publicly announced on July 28, 2026, and withdrawn on or about August 1, 2026, following near-universal opposition from FIFA's stakeholders.

12. I have reviewed a July 31, 2026 public statement by FIFA's own Chief Operating Officer describing the FFE proposal as follows: "the project that has sparked so much controversy and debate is not a FIFA project. It is even less a project of FIFA's administration. It is the project of one person," and further stating that FIFA's own administration, in addition to the FIFA Vice-Presidents, the FIFA Council, the confederations, the federations, the players, the leagues, the clubs, and the fans, had been "deceived." The FIFA Officer further describes the episode as reflecting "a lack of trust, a lack of transparency, a lack of discernment, a lack of good governance," and states that FIFA's mission is "to serve football, not to serve the personal interests of a person who, unfortunately, believes he embodies FIFA when he is supposed to be at its service." *See* Lamour Statement (Exhibit B).

13. I have also reviewed the resignation statement of Carlos Cordeiro, then a Senior Advisor to the FIFA President and a former President of the U.S. Soccer Federation, in which he stated that he "had no involvement in this proposal," that FIFA "already has access to extraordinary financial resources" and "sits on billions of dollars in reserves and no debt," such that "selling a permanent stake in football's most valuable asset to raise $4.2 billion makes little sense," and posed the unanswered question at the heart of the transaction: "Who benefits? Was there a competitive process? What governance will be in place? What will investors ultimately gain, and at what cost to football?" *See* Corderio Statement (Exhibit C).

14. I have further reviewed a statement by Arsene Wenger, FIFA's Chief of Global Football Development, confirming that he "was not involved in this strategic plan and first became

aware of the project through media reports." *See* Wenger Statement (Exhibit D).

15. UEFA and other interested parties are now preparing to lodge a criminal complaint in Switzerland against Infantino and possibly other FIFA officials and advisers under Article 158 of the Swiss Criminal Code ("SCC"), relating to criminal mismanagement, together with such further or alternative charges as the developed factual record may support, arising out of a transaction that, according to the explanations provided to me, was engineered by Infantino for his own personal, financial, and reputational advantage and, in the process, inflicted direct and concrete injury on all of FIFA's members, associations and affiliates.

16. I further understand that contemporaneous reporting indicated Infantino was considering a commissioner-style or chair role in the proposed new commercial vehicle carrying compensation of approximately USD 30 million per year, far in excess of Infantino's compensation as FIFA President; that this prospective arrangement was not disclosed to FIFA's members or confederations; and that no mechanism was established to ensure that Infantino's personal financial interest in the transaction did not influence his role in developing and advancing the transaction.

17. I have reviewed FIFA's own contemporaneous internal communications materials, including a July 29, 2026 set of "frequently asked questions" that FIFA circulated to its member associations, which expressly asked "Does FFE create a future role or compensation package for any specific individual?" and answered: "No. The proposal does not establish a future role or compensation package for any specific individual." *See* FIFA FAQs (Exhibit E).

18. That denial, made the day after the FFE proposal was publicly unveiled, is difficult to reconcile with the contemporaneous reporting that Infantino himself was already considering a paid commissioner-style role in the very entity being created, and is itself the kind of representation

that discovery from Thrive, Kushner, BANN, Maffei, J.P. Morgan and others concerning their own discussions with Infantino about his prospective role and compensation would help to test.

19. I understand that this is not the first occasion on which Infantino's personal conduct in office has been the subject of scrutiny or investigation, including prior inquiries into his personal use of FIFA resources and undisclosed meetings with Swiss prosecutorial authorities.

## II. <u>THE CONTEMPLATED CRIMINAL PROCEEDING</u>

20. Article 158 SCC provides, in relevant part, that "Any person who by law, an official order, a legal transaction or authorisation granted to them, has been entrusted with the management of the property of another or the supervision of such management, and in the course of and in breach of their duties causes or permits that other person to sustain financial loss shall be liable to a custodial sentence not exceeding three years or to a monetary penalty [...] If the offender acts with the intention of securing an unlawful gain for themselves or another, a custodial sentence not exceeding five years or to monetary penalty shall be imposed." art. 158 para. 1 SCC ("Criminal Mismanagement").[1]

21. Any person who commits a felony or misdemeanor in Switzerland is subject to the SCC. *See* Art. 3 para. 1 SCC. A felony or misdemeanor is considered to be committed at the place where the person concerned commits it, or unlawfully omits to act, and at the place where the offense has taken effect. Art. 8 para. 1 SCC. Criminal Mismanagement is a material felony with two results. The first is the financial loss (impoverishment) sustained by the aggrieved party. The second is the unlawful gain (enrichment) sought by the perpetrator, of which only the intention—to the exclusion of realization—is a constituent element of the offense. Accordingly, both the place where the financial loss occurred and the place where the unlawful gain sought by the perpetrator

[1] The Swiss federal government publishes an English language translation of the Swiss Criminal Code at https://www.fedlex.admin.ch/eli/cc/54/757_781_799/en.

was to occur, or did occur, constitute the place of the result within the meaning of Article 8 SCC.

22. Based on the factual record provided to me, FIFA is a Swiss association with its statutory seat in Zurich, the FFE proposal was developed and directed by Infantino from FIFA's Zurich headquarters, and any resulting financial loss to FIFA would be a loss to Swiss associations reflected in FIFA's Swiss-audited accounts. Because the place of the financial loss and the place from which the alleged abuse of authority was directed both lie in Switzerland, Swiss law enforcement authorities have jurisdiction over the Contemplated Criminal Proceeding under Articles 3 and 8 SCC. Within Switzerland, the local competent jurisdiction would be the Canton of Zurich, and the competent authority to investigate and prosecute the Contemplated Criminal Proceeding would be the public prosecutor's office having territorial jurisdiction over FIFA's registered seat in Zurich.

## III. UEFA'S STANDING TO BRING THE CONTEMPLATED CRIMINAL PROCEEDING

23. UEFA is entitled to report the conduct described herein to the Swiss law enforcement authorities under Article 301 para. 1 of the Swiss Criminal Procedure Code ("CrimPC"), which permits any person to denounce criminal offences, and the offence of Criminal Mismanagement is prosecuted *ex officio* irrespective of an application from an aggrieved person as defined by Article 115 CrimPC. UEFA is a Swiss association with its seat in Switzerland whose institutional rights within FIFA are fixed by the FIFA Statutes; whose members' commercial and reputational interests are directly and immediately affected by the permanent alienation of an interest in FIFA's commercial enterprise on the terms described in the Application submitted in connection with his Declaration; and whose 55 member associations are entitled to development funding drawn from the same revenue base that the FFE transaction proposed to sell in part. Accordingly, UEFA has legal standing to lodge a criminal complaint in Switzerland against Infantino and possibly other

natural persons to be identified.

24. UEFA has publicly characterized the FFE process as "governance by intimidation—an act of coercion unworthy of an institution entrusted with the stewardship of the global game," and has resolved, together with its 55 national associations, to oppose the transaction. UEFA's individual member associations, as constitutional voting members of FIFA under Article 26(1) of the FIFA Statutes have an equivalent and independent entitlement to report the conduct to the Swiss authorities.

25. The identity of the ultimate targets of the Contemplated Criminal Proceeding, and the final charges retained, will not be decided by UEFA but by the competent Swiss public prosecutor on the basis of the evidence gathered during the investigation, including any evidence obtained through the Section 1782 Applications. Potential defendants are any persons who are found to have perpetrated the criminal mismanagement, or such other offenses as the developed factual record may support.

## IV. SWISS AUTHORITIES ARE AMENABLE TO RECEIVING DISCOVERY OBTAINED THROUGH THIS APPLICATION

26. There is no indication that the competent Swiss prosecutor or criminal court would decline to receive or consider the documentary and testimonial evidence sought through the Section 1782 Applications. To my knowledge, the admissibility of evidence obtained through U.S. judicial assistance under 28 U.S.C. § 1782 has never been successfully challenged before a Swiss court of appeal. In my professional experience, such evidence has been routinely received and relied upon by Swiss prosecutors and courts in criminal proceedings, including in preliminary criminal investigations. Such evidence is therefore admissible in the Swiss criminal courts, and the Section 1782 Applications do not circumvent any proof-gathering restriction or exclusionary rule under Swiss law.

27. None of the recipients of the Section 1782 Applications are expected to be parties to the Contemplated Criminal Proceeding. Absent the assistance of the United States District Courts and the requested orders and subpoenas, this evidence and testimony would, in my experience, almost certainly remain outside the reach of the relevant criminal court of Zurich.

## V. THE DISCOVERY SOUGHT IN THE SECTION 1782 APPLICATION IS RELEVANT TO THE CONTEMPLATED CRIMINAL PROCEEDING

28. The discovery sought is not intrusive or unduly burdensome under Swiss law. UEFA seeks documentary and testimonial evidence concerning financial and transactional information that sophisticated investment and commercial advisers and their principals would ordinarily maintain in the regular course of evaluating and structuring a transaction of this kind, and UEFA's request is limited to matters directly relevant to the Contemplated Criminal Proceeding.

29. This discovery bears directly on the elements of the contemplated Article 158 SCC charge—the authority under which FIFA officials acted and any abuse of that authority, the financial-loss element, the intent element, and the identity of the transaction's beneficiaries.

30. In conclusion, this type of discovery as envisaged by UEFA through its Section 1782 Applications cannot be obtained through any alternative means available to UEFA or to the competent Swiss authorities.

31. For these reasons, I support UEFA's Section 1782 Applications.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed: August 26th, 2026
Switzerland

By: ______________________
André Kurz
Kurz Legal

*Counsel for Applicant Union des Associations Européennes de Football (UEFA)*

# EXHIBIT A

PRESIDENT

FIFA

Zurich, 28 July 2026

**FIFA Forward Enterprise**

Dear Vice Presidents,
Dear members of the FIFA Council,

As we reflect on the most inclusive and successful FIFA World Cup in history, I would like to begin by thanking you all for the role you played in making this a reality.

This role encompasses not only your support in the consideration and approval of all relevant aspects of the FIFA World Cup and all FIFA competitions for that matter, but also for the key role you play in the everyday development of our sports via your approval and oversight of the FIFA Forward Programme. This Programme is the cornerstone of global football development that feeds our success every four years and all the moments in between.

It is in this context I would like to kick-off the start of a consultation process and share with you a proposal which, if meeting the democratic approval of FIFA's Member Associations and you, the FIFA Council, has the power to transform the future of the FIFA Forward Programme and the development of global football for the years ahead.

The details of this proposal are outlined hereafter and will also be shared with the 211 Member Associations as part of this consultation process.

**A new, fit-for-purpose FIFA owned and controlled subsidiary - FIFA Forward Enterprise**

The vision behind FIFA Forward Enterprise is the establishment of a new, FIFA-owned and FIFA-controlled subsidiary which will consolidate our organisation's commercial and event delivery operations into a single and specific purpose-built entity. This entity will be fully focused on one target objective; generating as much value as possible for FIFA's Member Associations.

This new entity will have a governance structure and operating model that is fully tailored to and focused on this singular objective. It will be separated from and distinct to the regulatory and developmental focus that will continue to reside within FIFA as the parent and governing body.

The equity value of FIFA Forward Enterprise has been forecast at USD 20bn by JP Morgan Chase, one of the largest and most reputable banks in the world.

To leverage this value to finance future growth, this new subsidiary will be capable of taking on external capital investment. This will enable participating Member Associations to further improve and compete by expediting development in every single part of the world like never before, bringing meaningful investment to territories regularly ignored or left behind.

Fédération Internationale de Football Association
FIFA-Strasse 20 P.O. Box 8044 Zurich Switzerland T: +41 (0)43 222 7777 president@fifa.org FIFA.com

**Increased Forward funding**

The proposal, if implemented, would see Member Associations benefitting from the following resulting increases in Forward funding:

1) **FIFA Forward – USD 20m** per MA for the cycle starting 1 January 2027 allocated equally to all 211 Member Associations.

   This would continue to increase cycle-on-cycle; USD 22m for 2031-2034, USD 24m for 2035-2038, and so forth. It will be financed through guaranteed payments from the increased revenues unlocked via this newly established, commercially focused entity.

2) **FIFA Fast-Forward (a new programme) – USD 20m per MA** as a singular and unique funding opportunity only for those Member Associations who wish to participate, with their decision to be made by 19 September 2026 so we can plan ahead and with funds to be available immediately as of 1 January 2027.

   It will be financed by FIFA liquidating a minority portion of its share in FIFA Forward Enterprise to carefully selected long-term external investors without ceding control of any kind.

In total for the upcoming cycle starting as of 1 January 2027, each Member Association will have the possibility to access up to **USD 40m per Member Association** under this proposal.

Over a 12-year, 3-cycle period, this would represent cash payments of c. **USD 86m** (USD 40m + c. USD 22m + c. USD 24m) compared to the USD 3m received over the same time period before my election. So a very significant increase from 3m per MA to 86m per MA in the same period.

Furthermore, for the first time ever, FIFA will now retain a majority ownership (min. c. 80%) in a dedicated commercial and event entity, the future equity value of which will continue to increase and be recycled back into football through the MAs or on their behalf.

**A fully democratic decision in the hands of the Member Associations**

In keeping with our democratic principles, the implementation of FIFA Forward Enterprise will be entirely conditional on the following two steps:

1) The support by way of participation of a majority (>50%) of FIFA Member Associations in the process by the deadline stipulated;
2) The express approval by the FIFA Council to enact the requisite adjustments to the Forward Programme.

Should neither condition be satisfied, FIFA will continue as planned with the Forward Programme 4.0 as communicated to the FIFA Member Associations in April of this year (meaning c. 10m per MA for the next cycle).

**A valuable commitment**

It is my duty and responsibility as FIFA President to present such game-changing opportunities to the FIFA Member Associations and to you, the FIFA Council. It is equally my duty and responsibility to ensure such proposals are sufficiently complete and feasible, replete with substantiated figures and clear terms to assist you in the decision-making process. Obviously this proposal has been elaborated by our experts at the FIFA Administration who are working tirelessly at your service in accordance with their mandate.

With this in mind, the financial commitment of an anchor investor in FIFA Forward Enterprise has been secured, Thrive Capital, who have agreed to underwrite this proposal. Through this secured commitment, FIFA Forward Enterprise will guarantee the following:

- The substantially increased FIFA Forward Programme payments ($20m and increasing cycle-on-cycle) to all members as outlined above
- The once-off new FIFA Fast Forward Programme payment ($20m) to all members who wish to access it as outlined above
- Costs of other existing development programmes operated by FIFA
- Costs of non-commercial and non-event related operations of FIFA as the parent and governing body (e.g. legal and regulatory, development, governance, etc.)

In total the complete proposal represents a package of **over USD 10bn** for the next cycle only.

Failure to meet any of the above payments will result in the revocation of the license granted by FIFA to its own subsidiary FFE and a reversion to status quo.

Should the majority of Member Associations democratically support the proposal, and the FIFA Council approve thereafter, a pool of diverse international investors from all around the World will be onboarded in addition to the anchor investor. This process will be led by J.P. Morgan for and subject to the ultimate approval of the FIFA Administration.

Clear rules regarding these investors are already set and agreed, and will be implemented to ensure diversification. This encapsulates elements such as caps of individual ownership amounts and amounts held by individual geographic regions.

**No change to FIFA's governance model**

The rights and obligations of the FIFA Member Associations and the retention of FIFA's existing governance structure, including the role of the FIFA Council, will remain unchanged.

Specifically:

- There will be no change to the FIFA Statutes required and all rights and obligations as set out therein will remain untouched;
- FIFA will retain a perpetual majority ownership of the new entity and will remain in full control of any change of ownership structure in future;
- FIFA will retain further control by way of numeric majority of the Board of the new entity;

- FIFA will retain full and exclusive control and decision-making over all competition-related matters including formats, number of teams, slot allocations and hosting;
- FIFA will retain full and exclusive sports authority over all other sporting decisions;
- All net benefits of the new entity on top of the guaranteed payments mentioned above will be reinvested back into football;
- All existing FIFA competitions are guaranteed to remain as they are unless FIFA should decide otherwise in the future;
- All ownership of IP and other commercial assets will remain with FIFA, with these assets being licensed to this new entity in exchange for the guaranteed payments;
- As previously mentioned, any failure to make these guaranteed payments to FIFA will result in the license automatically being revoked to FIFA and the status quo reinstated.

**What happens next**

The feedback gathered from the FIFA Member Associations as part of this consultation process will be shared with you for consultation ahead of your consideration of the proposal and the associated regulatory changes required to enact the increased payments under the Forward Programme.

I would like to conclude by thanking the FIFA Administration for their great work in elaborating this fantastic proposal for World football and to all of you for the trust you have placed in me over the last decade. This trust gives me the energy required to continue in our mission to make football truly global.

Yours in football,

Gianni Infantino

# EXHIBIT B

Statement by the COO of FIFA

Since I joined FIFA a little less than two years ago, I've gone from one surprise to the next. I've seen enough to make a great series. But what has been announced in recent days and what has been happening behind the scenes in recent months defies belief and imagination.

To put it very clearly and directly: the project that has sparked so much controversy and debate is not a FIFA project. It is even less a project of FIFA's administration. It is the project of one person.

The FIFA Vice-presidents, the members of the FIFA Council, the confederations, the federations, the players, the leagues, the clubs, and the fans were not the only ones who were ignored. FIFA's own administration was also deceived. This lie by omission over many months and this unilateral exercise of power are not trivial. They are indicative of a lack of trust, a lack of transparency, a lack of discernment, a lack of good governance. And a serious lack of respect.

Not only must this project not go ahead - for obvious reasons that need not even be listed here - but the time has now come for football political leaders to ask themselves the right questions and make the right decisions. Regarding this project and what comes next. Everyone must take responsibility. Because it is becoming increasingly difficult for FIFA's administration to work under these conditions and fulfill its mission.

Our mission - the mission of the hundreds of passionate, dedicated, and exemplary FIFA employees - is to serve football. Not to serve the personal interests of a person who, unfortunately, believes he embodies FIFA when he is supposed to be at its service.

A president must bring people together, unite them, and inspire them. Today, we are experiencing the opposite.

I have no authority to speak on behalf of my colleagues, and perhaps I am mistaken. But my feeling is that we all want to be proud to work for FIFA, and today, unfortunately, it seems that is no longer the case for many of us. That saddens me. My colleagues - some of whom have dedicated their lives to football - deserve better than contempt and intimidation.

The ball is now in the court of those who have the power to change things.

I know I have a duty of loyalty to my employer. But I also, and above all, have a duty of loyalty to certain values and to the upbringing I have received, and a duty to support my colleagues. And if that means I lose my job, then so be it. I will understand and respect that decision. At least I'll sleep well tonight.

# EXHIBIT C



**Carlos Cordeiro** • 2nd
Football executive, former investment banker
3w •

Connect ···

As a Senior Advisor to the FIFA President, a former banker, and a lifelong football fan, I cannot stand by while FIFA considers selling a stake in the World Cup.

Let me be clear: I had no involvement in this proposal, and I oppose it unequivocally. It is a bad deal for FIFA's Member Associations, a bad deal for football, and a bad deal for the long-term future of the game.

Football has been central to my life, and after more than 35 years in banking, I understand both the value of this asset and the consequences of giving part of it away. That is why this proposal should be rejected.

FIFA already has access to extraordinary financial resources. The organization sits on billions of dollars in reserves and no debt. The FIFA President himself has highlighted the $15 billion in revenue generated between 2022 and 2026. If Member Associations believe additional investment is needed to develop the game, FIFA already has the financial capacity to provide that support from its existing resources. Against that backdrop, selling a permanent stake in football's most valuable asset to raise $4.2 billion makes little sense. It is mortgaging football's future without any compelling justification.

Such economic success was not accidental. It was delivered by experienced football professionals who shattered FIFA's commercial records. Yet despite those achievements, FIFA is now being asked to believe that outside investors are needed to unlock greater value. I do not accept that proposition. The people who built this success have already demonstrated that FIFA possesses the expertise to continue growing both the game and its commercial future.

Most troubling of all is the absence of answers to fundamental questions. Why this deal? Why now? What oversight exists? Who benefits? Was there a competitive process? What governance will be in place? What will investors ultimately gain, and at what cost to football?

These questions remain largely unanswered, and yet Member Associations are being asked to make a decision of enormous consequence in barely 50 days or risk being left behind. That is not a responsible way to determine the future of the world's game.

This proposal has become a defining question for FIFA's future. After careful consideration, I can no longer continue in my role as Senior Advisor to the FIFA President. I have therefore resigned with immediate effect.

FIFA's responsibility is not to maximize commercial returns at any cost. It is to protect and strengthen football for future generations. When those principles come into conflict, football must come first.

It has been the privilege of a lifetime to serve FIFA for more than five years and to work alongside dedicated, principled people who care deeply about the game. I hope they, too, will speak up, because decisions of this magnitude should be made in the interests of football, not those who stand to profit from it.

Kyle Cooke and 6,656 others · 50 comments • 428 reposts

Like · Comment · Repost · Send

# EXHIBIT D


The recent events at FIFA deserve some clarity from my side. At FIFA, I am the Chief of Global Football Development. Together with my team, I oversee the data analysis of the game, the FIFA online training centre, the development of youth education through 60 academies across 60 countries where they are most needed, and youth competitions around the world.
In addition, I am a technical adviser to IFAB. I was not involved in this strategic plan and first became aware of the project through media reports.
The decision to withdraw the project was absolutely necessary and beyond question, because I firmly believe in an independent FIFA that serves our game with commitment, transparency, and integrity.
Arsene Wenger statement clarifying his position at FIFA in light of recent controversy
sky sports
FIFA

# EXHIBIT E

FIFA®

# FIFA Forward Enterprise (FFE)

**Wednesday, 29 July 2026**
**Frequently asked questions (FAQs)**

## FIFA Forward Enterprise (FFE)

**Overview:**

### What is FIFA Forward Enterprise (FFE)?

- If approved by FIFA's Member Associations (MAs) and the FIFA Council following the conclusion of a consultation process launched on 28 July 2026, FFE would be a FIFA-owned and controlled subsidiary consolidating FIFA's commercial rights and event operations.
- It would be an addition to the various already existing FIFA subsidiaries established over the years, each of which have their own dedicated and distinct functions.

### What would FFE be responsible for?

- FFE would manage FIFA's commercial rights and event operations, covering all FIFA-owned competitions along with sponsorship, broadcast, licensing, ticketing, hospitality and new ventures.
- Its mandate would be to grow the value of these properties for the benefit of FIFA's 211 MAs and the wider game, unlocking commercial value that has previously gone uncaptured.
- As these revenues grow, distributions to MAs would also increase, giving associations more funding to grow the game, widening access for fans and invest in infrastructure and grassroots football.

### How would FFE benefit football?

- Too little of football's growing commercial value has reached the parts of the game that need it most.
- Capturing that value properly requires additional expertise and insight, distinct from governing and developing the sport and requiring full focus. This is why other bodies, including Formula One and leagues such as La Liga, Ligue 1 and the Bundesliga run dedicated commercial operations.

FIFA®

- Over the past decade, FIFA has transformed itself through sweeping governance reforms and a major expansion of development and transformation of competitions. Further strengthening the commercial side of the game is the natural next step in this evolution, so more of this value can be reinvested back into the sport.
- FFE would take this forward for FIFA, with its own management team and Board of Directors strengthening the commercial delivery of FIFA's tournaments and rights across men's, women's and youth football.

**What would stay with FIFA, and what would change?**

- FIFA would continue to do everything it does today to govern and develop football, including regulating and defining competitions, organising and overseeing tournaments, leading football's global grassroots development and remaining answerable to its 211 MAs.

**Would FIFA become a for-profit organisation?**

- No. FIFA would remain the same not-for-profit, member-led global governing body, accountable to its 211 MAs, with its revenues reinvested into the development of football globally.
- FFE would be a controlled commercial subsidiary, responsible for commercial delivery and operations as opposed to sporting governance.
- FIFA already has several subsidiaries to handle different parts of its operations. In this respect, establishing subsidiaries is nothing new for FIFA.

**What would this mean for fans?**

- The game fans watch and love won't change. FIFA will continue to govern football and the flagship tournament's it organises will always remain.
- However, a stronger commercial operation would mean more revenue returned to FIFA's 211 MAs, funding better pitches, stronger national teams, more pathways for young players, and greater support for women's football.
- This growth would also allow FIFA to reach and engage the next generation of supporters, bringing the game to new audiences and markets, as well as deepening the experience for the billions who already follow it.
- The benefits of sustained investment are already visible. A decade of rising support through FIFA Forward helped nations like Cabo Verde, Curaçao, Jordan and Uzbekistan reach the FIFA World Cup™ for the first time, and a

stronger commercial operation means more investment reaching every corner of the game.
- FFE would also bring dedicated commercial expertise to FIFA's biggest events, with the aim of making them even more accessible and valuable to the sport.

**What needs to happen for FFE to go ahead?**
- FIFA President Gianni Infantino: "My job as President is to create the conditions for football to prosper worldwide, and to build value that is shared and lasting. With that goal, we have worked with the FIFA administration over these months to bring this opportunity to all of you (i.e. the 211 FIFA Member Associations), with no one left out. The decision, though, belongs to you: it is your choice whether to take it. In keeping with our democratic principles, this will move forward only if a majority of you decide it, if a majority of you decide that it is the right thing to do, together with the FIFA Council's approval (of the required regulatory updates). And if you do, my commitment – and my guarantee – is to deliver it, in the interest of all."

**Does FFE create a future role or compensation package for any specific individual?**
- No. The proposal does not establish a future role or compensation package for any specific individual. FFE would have a dedicated management team and Board of Directors. None of these roles have been filled yet. Should the project be supported and approved by a majority of MAs and the FIFA Council, an appropriate process will be conducted to fill these roles.

**Why is FIFA exploring bringing in outside investors?**
- Organisations and individuals have invested in football since the professionalisation of the game in the early 20th century – including in clubs, stadiums and commercial entities like the one FIFA is proposing to create now.
- Outside investment supports organisations by providing resources to enable them do things they would not otherwise be able to do with their own resources: build infrastructure, hire employees and expand their activities.

- The creation of FFE would allow FIFA's MAs to do the same, expanding access and quality of football in their countries, without giving up their important role in helping FIFA govern the game globally.

**Structure**

**Who would own and control FFE?**

- FIFA would retain sole control of FFE, including control of its Board and a majority, controlling interest in the company itself. In approximate terms, a maximum of 20% of the equity of FFE would be liquidated to finance specific development activities, only in those MAs that ask for it. FIFA would retain the majority interest of 80%.

**How would FFE work in practice?**

- FFE's management team would take charge of FIFA's full range of commercial and event operations, negotiating broadcast rights deals, managing sponsorship and partnership programmes, overseeing ticketing and hospitality, and developing new revenue streams.
- The revenue FFE generates would flow back to FIFA and its MAs to reinvest in the sport via the FIFA Forward programme.

**Who would lead FFE?**

- FFE would have its own dedicated management team and Board of Directors, with deep experience in running major commercial operations.
- Keeping this leadership distinct from FIFA's governing role allows the commercial side to be run with focus, whilst the sport continues to be governed independently.

**How was FFE valued, and how much would be raised?**

- FFE has an implied equity valuation of USD 20 billion, determined by J.P. Morgan based on customary valuation analysis.
- On that basis, FFE plans an initial capital raise of up to USD 4.2 billion, based on an initial equity valuation of USD 20 billion, by carefully selecting long-term investors who would purchase the minority, non-controlling interests in FFE. These investors would act as minority, long-term partners. FIFA would retain sole control of FFE via majority Board representation.

FIFA®

**Is FIFA selling the FIFA World Cup™?**

- No. The FIFA World Cup™ is not for sale, and nor is any part of FIFA's governance of the game. FIFA is proposing a FIFA-owned and controlled commercial subsidiary to bring dedicated commercial expertise and long-term capital to its existing rights and events.
- The aim is to unlock more value for reinvestment in the game, including optional FIFA Fast Forward Programme (FFFP) funding for exceptional development projects such as stadiums and national training centres.

**Would private investors gain any influence over how the FIFA World Cup™ or FIFA itself is run?**

- Absolutely not. Investors would hold a minority, non-controlling stake in FFE – a commercial subsidiary – not in FIFA. They would have no seat on FIFA's Council, no vote in FIFA's Congress, and no role in decisions on matters such as the FIFA World Cup's format, frequency, expansion, or any other sporting or regulatory matter. Those decisions remain solely for FIFA's 211 MAs to take through FIFA's existing governance structures. FIFA would retain sole control of FFE itself, including a majority of its Board and a controlling equity interest.

**What would investors receive in return for their capital?**

- Investors would hold a stake in FFE itself, which they could sell during future tender processes overseen by FIFA. The vetting process prioritises patient, long-term capital over short-term returns, so that investors are aligned with FIFA's long-term mission to grow the game.
- Investors have no role in, and no influence over, decisions on competition format, frequency, or expansion. Such matters remain solely for FIFA's Congress and Council to decide, in line with FIFA's existing governance processes.

## FIFA Member Associations

**What would the benefit be for FIFA Member Associations?**

FIFA®

- All 211 FIFA MAs would receive significantly increased development funding as a result of FFE: through an increase in the amounts distributed under FIFA Forward and through an optional new FIFA Fast Forward Programme.

**What would the increase be and where would it come from?**

- Funding under FIFA Forward would rise from USD 8 million per MA under the 2023-26 cycle to USD 20 million per MA for 2027-30, totalling over USD 4 billion across all 211 MAs. This increase would be funded by the additional commercial revenue FFE is projected to generate.
- Each MA would also have the option to access a further USD 20 million through the FIFA Fast Forward Programme, taking the potential total funding to USD 40 million per MA for the cycle.
- FIFA President Gianni Infantino: "This is a big step forward for FIFA, for you – our FIFA Member Associations – and for world football. But we are not afraid of big steps. Once again, before you elected me, you could rely on USD 250,000 per year or USD 3 million over a 12-year, three-cycle period. Now, with FIFA Forward Enterprise, you will receive up to USD 86 million over the same time period, an increase of almost 2,800%."

**Would Member Associations be offered FFE shares or paid to approve the proposal?**

- No. MAs will not receive ownership stakes in FFE. Each MA retains exactly one vote in Congress, and FFE can proceed only if a majority supports it and the FIFA Council approves the necessary regulatory updates.
- The proposed funding is FIFA Forward and FFFP development funding – not an equity allocation. Projects remain subject to approval, audit and reporting.

**FIFA Fast Forward Programme**

**What is the proposed FIFA Fast Forward Programme (FFFP), and why is it needed?**

- FFFP would be a new option within FIFA Forward, enabling each MA to access a further USD 20 million in funding during 2027-30, on top of the USD 20 million per cycle it would also receive. This would take potential funding for participating MAs to USD 40 million before the FIFA World Cup 2030™.

- FIFA believes FFFP is needed to unlock and turbocharge long-term development projects, such as stadiums and national training centres, that would otherwise be out of reach within a single FIFA Forward cycle.
- These investments will contribute to better returns and performance later on, which increases the value of the commercial offerings in the future, for the benefit of all.

**Would FFFP be mandatory for MAs?**

- No. FFFP would be a voluntary offer to all 211 MAs sitting within the existing FIFA Forward framework, which has proven a robust vehicle for development funding since its inception in 2016.
- In keeping with FIFA's democratic principles, the new structure would only be launched should a majority of MAs decide to support it, with the required approval by the FIFA Council also being necessary. No MA is obliged to take part.

**What could MAs use FFFP funding for, and how would they access it?**

- FFFP funding is intended for extraordinary, long-term development projects beyond the reach of a single FIFA Forward cycle, such as stadiums and national training centres.
- To receive it, MAs would submit a specific project for approval, with spending audited and reported to FIFA's committees under the existing FIFA Forward eligibility criteria and application process.

**Where would the additional FFFP funding come from?**

- The funding would come from the sale of a minority, non-controlling stake in FFE to a geographically diversified group of long-term investors. These investors would be selected against clear long-term, governance, and strategic criteria, through a process led by J.P. Morgan working alongside the FIFA administration. All investors would act as minority, long-term partners, contributing capital and commercial expertise in support of FIFA's mission to grow the global game.

**What other programmes make up the USD 10 billion total development funding figure?**

- FIFA Forward 4.0 and FFFP together account for over USD 8 billion of the USD 10 billion total. The remainder comes from FIFA's other existing development programmes, including the Football Development Fund, the FIFA Women's Football Development Programme, technical development programmes tailored to individual MAs and the FIFA Foundation, as well as operating expenses of FIFA relating to its development activities.

**What's next?**

**Has this already been set up without input from others? What are the next steps?**

- No this has not been set up already. The consultation process launched on Tuesday, 28 July 2026 will continue with further details being shared with Member Associations and the FIFA Council.
- If approved by both these bodies, FFE would begin operations at the start of the new FIFA Forward funding cycle in 2027, following standard corporate processes in line with all legal and procedural requirements.
- The new structure will only proceed if a majority of MAs support it and the Council approves. FIFA will also confirm which MAs intend to seek FFFP funding.

**ENDS**